JAMES HUSSEY, BY HIS NEXT FRIEND, JOHN HUSSEY, RESPONDENT, v. THE LONG DOCK RAILROAD COMPANY, A CORPORATION, AND ERIE RAILROAD COMPANY, A CORPORATION, APPELLANTS.

JOHN HUSSEY, RESPONDENT, v. THE LONG DOCK RAILROAD COMPANY, A CORPORATION, AND ERIE RAILROAD COMPANY, A CORPORATION, APPELLANTS.

Argued May 23, 1924—Decided October 20, 1924.

1. The use of a yard in the rear of a building by a tenant, or a member of his family, is not limited to its use as a means of access to the cellar of the building, but may be for any reasonable use to which such yards are ordinarily applied.

2. The waiting in a yard for a friend by the son of a tenant of a building in which the family resides, does not constitute such person a mere licensee.

3. The landlord of a building owes a duty to his tenants to use reasonable care to keep such portions of the premises as are used by the tenants in common in a safe condition, and this duty is an absolute one, and cannot be evaded by the excuse that the faulty condition of a fire escape is due to the act of an independent contractor in placing it upon the building.

On appeal from the Supreme Court.

For the appellants, *Collins & Corbin.*

For the respondents, *Perkins & Drewen.*

The opinion of the court was delivered by

LLOYD, J. These actions were brought in the Supreme Court to recover damages for personal injuries received by James Hussey and occasioned by the falling of a fire escape attached to a six-family apartment-house in Jersey City, the fall being claimed to be due to the negligence of the defendants. The Long Dock Railroad Company and the Erie Railroad Company leased to John Hussey the lower right apart-

ment of 347 Baldwin avenue under a written lease, and Hussey with his family, of which James Hussey. a son, was one, occupied it at the time of the accident on August 20th, 1923. Attached to the apartment-house was a rear yard into which a hallway ran from the front of the building and through it on the ground floor. On the day in question James Hussey was waiting in the yard for a friend with whom he was expecting to eat dinner. While standing under the fire escape a portion of it became loosened from the wall and fell upon and injured him. The fire escape was fastened to the rear wall and was maintained by the defendants and intended for the general use of all the tenants in case of fire. It was shown that the wall was old and crumbled and that it was not calculated to withstand the strain of weight of the fire escape; that this condition was one of long standing and knowledge thereof fairly chargeable to the defendants. There was also some evidence that the faulty condition of the wall had actually been called to the defendants' attention.

The first two points argued are that there was no evidence of the defendants' negligence. These contentions cannot be maintained in view of the proofs just noted.

The third and sixth points are that the plaintiff, James Hussey, was a mere licensee, and that, in consequence, the only duty owing was to refrain from willful injury. We think the learned trial judge rightly held to the contrary. This contention is predicated upon the terms of the lease and the injured plaintiff's relation to the leased premises. The pertinent provisions of the lease are:

"Said lessee for himself, his heirs, executors, administrators, successors and assigns, hereby assume all risk of loss, damage or injury by fire, accident, collision or otherwise, to property or person, on or about said leased premises, arising out of the condition or location of said leased premises, or the operation, maintenance or existence of the railroad operated by said lessor, its successors or assigns, or any of its appurtenances; and agrees to indemnify and save harmless said lessor, its successors and assigns, from all claims for any and all such loss, damage or injury, whether caused by the neg-

ligence of said lessor, its successors or assigns, or by the neg-
ligence of its or their servants, agents or employes, or other-
wise."

It must, of course, be recognized that the rights of the in-
jured son could rise no higher than those of the father, the
tenant.  While conceding that whatever duty existed was
owing equally to each, it was urgently insisted by the appel-
lant's that in using the yard as a waiting place for his friend
James held the status of a licensee, inasmuch as the yard was
only intended as a means of ingress and egress to the cellar-
way under the building.  As before noted, the tenement had
a rear yard into which a common passageway entered.  It
was there in pursuance of a requirement of law (*Pamph. L.*
1904, *p.* 115), which reads:

"Behind every tenement-house hereafter erected there shall
be a yard extending across the entire width of the lot, and,
except upon a corner lot, at every point from the ground to
the sky, unobstructed," &c.

It would be narrowing the purpose of the yard beyond any
reasonable interpretation of the statute to hold that it was
limited in its use to a means of getting into and out of the
cellar.  Part of its purpose is to afford light and air to the
tenants, and we think also to serve any other reasonable use
to which yards in cities are ordinarily applied.  The act of
the boy in waiting for his friend may well have been such.
If so, he was in the yard, not as a mere licensee, but in the
exercise of a right as a member of his father's family.

It was next argued that by the terms of the lease the boy
assumed the risk of injury.  A careful examination of the
lease does not lead to this conclusion.  As we read it the
lessee assumed the risk of injury arising from the condition
of the leased premises or by the operation of the railroad
(which was located near it).  The word "appurtenances,"
under which the appellants claim the assumption of risk to
exist, appears at least two times in the lease.  The lessors
were two railroad companies which were operating a rail-
road in close proximity to the building.  The clause already
quoted indicated that the lessors were solicitous about claims

for damages by the tenants of this tenement-house by reason of the condition of the particular portions leased to them or by reason of the operation of the railroad so near the building, and it is more than doubtful if the word "appurtenances" was intended to apply to the leased premises, but rather to the railroad itself; the language being that the lessee assumed the risk of damages on or about the leased premises arising out of their condition or location, and then goes on to say "or the operation, maintenance, existence of the railroad * * * or any of its appurtenances." It would thus appear that the word "appurtenances" rather referred to the railroad than to the leased apartment. Without, however, resorting to this interpretation of the lease, and assuming that the word "appurtenances" applies to the leased premises, it cannot be construed to extend to those portions of the building and its curtilage which formed no part of the individual lease, but were under the care and control of the landlord, and as to which he assumed the duty of using reasonable care to maintain in a safe condition for the use of all tenants. That this construction is the correct one is evident from the provisions of paragraph 3, which require the tenant to keep the leased premises and "appurtenances" in good and sanitary condition, free from all accumulation of rubbish. It can hardly be contended that, by reason of the word "appurtenances" in this paragraph, the individual tenant assumed responsibility for the care of those portions of the general property not within his lease. The same word, being used in both cases, will fairly give rise to the presumption that its meaning was not dissimilar.

It is next contended that the construction of the fire escape was the work of an independent contractor for whose negligence the lessors would not be responsible. One difficulty with this claim is that the fault was not with the fire escape but with the wall. So far as appears the fire escape itself was without fault, and so was its method of attachment to the wall. The real defect was in the wall itself. This was insufficient for the burden placed on it by direction of the lessors, and for this insufficiency the lessors are responsible.

Even were the fault with the fire escape, its construction under contract by a third person would not relieve the landlord. Our decisions are emphatic that as to those portions of an apartment property reserved to the landlord for his care, preservation and repair, the landlord owes a duty to his general tenants which he cannot escape. This duty is to use reasonable care to see that such portions of the general premises are reasonably safe for the use of the tenants and those who are impliedly invited to come upon them. *Siggins* v. *McGill,* 72 *N. J. L.* 263; *Ryan* v. *Railroad Co.,* 72 *Id.* 266. This duty, like the duty of a master to use like care to supply his servant with safe equipment on which and with which to perform his work, cannot be delegated or transferred. *Wilczynski* v. *Pennsylvania Railroad Co.,* 90 *Id.* 178. The defense which arises upon the employment of an independent contractor has no place in such a situation. As the master cannot shift his responsibility for a duty owing to his employe, so the landlord cannot shift the responsibility assumed by him to his tenants to make the common ways and equipment reasonably safe in so far as ordinary care can effect that result. *Sebeck* v. *Platt Deutsche Volkfest Verein,* 64 *Id.* 624, and cases cited in 29 *Cyc.* 477. The distinction must be clearly drawn between the ordinary case of negligence, where the duty is to abstain from acts of wrongful injury, whether those acts be of commission or omission, and the neglect of a positive duty imposed either by law or by the acts of the parties. As we have found, there was evidence to justify a finding that the injured plaintiff in this case was an invitee of the landlord, it follows that the landlord had assumed a duty with respect to the fire escape for his safety. This duty was one that it could not escape by the attempted transfer to another. The duty was his, and, whether attempted to be performed by him directly or indirectly through others, it remained his to the end and could not be avoided.

The foregoing disposes of the substantial grounds of appeal. Finding them all without merit, the judgment in each case will be affirmed, with costs.

*For affirmance* — THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE, GARDNER, VAN BUSKIRK, CLARK, MCGLENNON, KAYS, JJ. 15.

*For reversal*—None.